UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HENRY A. JONES,<br><br>    Plaintiff,<br><br>    v.<br><br>DR. JAFFE et al.,<br><br>    Defendants. | No. 2:11-cv-2049 KJM DAD P<br><br>ORDER AND<br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking relief under 42 U.S.C. § 1983. This matter is before the court on a motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure on behalf of defendant Dr. O'Neill. Plaintiff has filed an opposition to the motion, and defendant has filed a reply. For the reasons discussed below, the court will recommend that defendant's motion for summary judgment be granted.

**BACKGROUND**

Plaintiff is proceeding on a second amended complaint against defendant Dr. O'Neill. Therein, plaintiff alleges as follows. In January 2007, plaintiff began to feel tightness around his jaw and throat. Prison officials sent him to the prison infirmary and then out to Mercy Hospital as a purported precaution. At the hospital, plaintiff underwent several tests, including a coronary artery disease surgical camera screening. Ultimately, defendant Dr. O'Neill told plaintiff that he

1

needed a defibrillator implant in order to survive. For several days thereafter, plaintiff refused the defibrillator implant but eventually consented to the surgical procedure, which defendant Dr. O'Neill performed on or about January 17, 2007. Plaintiff claims that defendant Dr. O'Neill threatened him and detained him in order to persuade plaintiff to accept an unnecessary and expensive operation for the defendant's own financial gain. Since plaintiff's surgery, various medical personnel have allegedly told plaintiff that his psychotropic medication caused the symptoms he experienced back in 2007, and that he never needed the "recalled" defibrillator implant. Plaintiff claims that defendant Dr. O'Neill's conduct violated the Eighth Amendment. In terms of relief, plaintiff seeks monetary damages. (Sec. Am. Compl. at 15-30.)

## SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically store information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.). See also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See

1  Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the
2  nonmoving party's case necessarily renders all other facts immaterial." Id.  In such a
3  circumstance, summary judgment should be granted, "so long as whatever is before the district
4  court demonstrates that the standard for entry of summary judgment, . . ., is satisfied." Id. at 323.

5  If the moving party meets its initial responsibility, the burden then shifts to the opposing
6  party to establish that a genuine issue as to any material fact actually does exist. See Matsushita
7  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the
8  existence of this factual dispute, the opposing party may not rely upon the allegations or denials
9  of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or
10 admissible discovery material, in support of its contention that the dispute exists. See Fed. R.
11 Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the
12 fact in contention is material, i.e., a fact that might affect the outcome of the suit under the
13 governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,
14 Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is
15 genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving
16 party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

17 In the endeavor to establish the existence of a factual dispute, the opposing party need not
18 establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual
19 dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at
20 trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce
21 the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"
22 Matsushita, 475 U.S. at 587 (citations omitted).

23 "In evaluating the evidence to determine whether there is a genuine issue of fact," the
24 court draws "all reasonable inferences supported by the evidence in favor of the non-moving
25 party." Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  It is
26 the opposing party's obligation to produce a factual predicate from which the inference may be
27 drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),
28 aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

**OTHER APPLICABLE LEGAL STANDARDS**

I.  Civil Rights Act Pursuant to 42 U.S.C. § 1983

> The Civil Rights Act under which this action was filed provides as follows:
> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Moreover, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of respondeat superior and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

II.  The Eighth Amendment and Inadequate Medical Care

The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986); Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).  In order to

4

prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur. Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

If a prisoner's Eighth Amendment claim arises in the medical care context, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106. An Eighth Amendment medical claim has two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104). Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities." Id. at 1059-60. By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation. Farmer v. Brennan, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference. See Farmer, 511 U.S. at 834. In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison officials provide medical care. Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir. 1988). Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06). See also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a

5

prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same). Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" Farmer, 511 U.S. at 835.

Delays in providing medical care may manifest deliberate indifference. Estelle, 429 U.S. at 104-05. To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful. See Hallett v. Morgan, 296 F.3d 732, 745-46 (9th Cir. 2002); Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). In this regard, "[a] prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

Finally, mere differences of opinion between a prisoner and prison medical staff or between medical professionals as to the proper course of treatment for a medical condition do not give rise to a § 1983 claim. See Snow v. McDaniel, 681 F.3d 978, 988 (9th Cir. 2012); Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND EVIDENCE**

Defense counsel has submitted a statement of undisputed facts supported by declarations signed under penalty of perjury by defendant Dr. O'Neill and Dr. Byron Lee. That statement of undisputed facts is also supported by citations to additional evidence in the record, plaintiff's responses to defendant's discovery requests, and plaintiff's medical records. The evidence submitted by the defendant in support of the pending motion for summary judgment establishes the following.

Defendant Dr. O'Neill was at all times relevant to this litigation a private physician. He was not an employee of the State of California Department of Corrections and Rehabilitation, or any other state, federal, or other government entity when he treated plaintiff in January 2007. Defendant Dr. O'Neill was also not acting under any contract with the State of California

6

Department of Corrections and Rehabilitation or any other state, federal, or other government entity when he treated plaintiff in January 2007. Finally, defendant Dr. O'Neill had no administrative role with the State of California Department of Corrections and Rehabilitation, or any other state, federal, or other government entity when he treated plaintiff in January 2007. (Def.'s SUDF 1-2 & 6, O'Neill Decl.)

Defendant Dr. O'Neill was not a prison-based physician when he treated plaintiff in January 2007, and he did not treat plaintiff at any prison or other government facility. Instead, he treated plaintiff at Mercy General Hospital, a private medical facility. Dr. Walt Marquardt, another private physician, referred plaintiff to defendant Dr. O'Neill. Defendant Dr. O'Neill's medical care provided to and interactions with plaintiff were no different than the medical care and interactions that would have taken place with any non-incarcerated patient with similar medical conditions and presentations. Defendant Dr. O'Neill's medical care, judgments, and treatment of plaintiff were free of control, interaction, or direction of the State of California Department of Corrections and Rehabilitation, or any other state, federal, or other government entity. (Def.'s SUDF 3-5 & 7, O'Neill Decl.)

Turning to plaintiff's medical background and defendant Dr. O'Neill's treatment of plaintiff's medical needs, plaintiff had a brother who passed away due to heart problems. His death was described as sudden and occurring at a young age. Plaintiff's mother passed away due to heart problems as well. In January 2007, plaintiff was being administered the medication Seroquel against his will pursuant to a Keyhea court order for his psychiatric problems. At 7:00 a.m. on January 13, 2007, plaintiff complained to a registered nurse at the prison infirmary that he was experiencing chest pain. He related that the pain had caused him to brace himself from falling to the floor with his back against the cell door. Medical personnel treated plaintiff with a nitroglycerin tablet. (Def.'s SUDF 8-11, Lee Decl. & Exs. D & F, Pl.'s Am. Compl.)

Later that same day, prison officials transferred plaintiff to the emergency department at Mercy Hospital of Folsom. Dr. Ken Johnson noted that plaintiff's chief complaint at the time was chest pain. Plaintiff described it as pressure and aching located in the central chest area and radiating to the throat and jaw. An EKG performed in the emergency room showed tall,

1   hyperacute T waves in leads V3 and V4 consistent with ischemia, and T wave inversion in lead
2   V6.  Plaintiff's QTc was measured at 454 ms.  Plaintiff was treated with nitroglycerin, Lopressor,
3   and Levnox.  Dr. Johnson's clinical impression was non-ST elevated myocardial infarction with
4   elevated markers and EKG changes.  Plaintiff was transferred to Mercy General Hospital for a
5   cardiac catheterization.  (Def.'s SUDF 12, Lee Decl. & Ex. F.)

6   When plaintiff arrived at Mercy General Hospital, Dr. Walt Marquardt performed a
7   cardiac catheterization on him.  Dr. Marquardt noted an ejection fraction of 60%, elevated
8   troponin-I of .91, transient hypertension, angiographically normal epicardial coronary arteries,
9   and normal left ventricular systolic and diastolic function.  About six hours after the
10  catheterization, Dr. Marquardt was called to see plaintiff regarding an episode of rapid sustained
11  wide complex tachycardia.  Plaintiff was syncopal during the episode, which he recovered from
12  spontaneously.  Dr. Marquardt's assessment was that plaintiff had experienced right ventricular
13  outflow tract ("RVOT") tachycardia.  Dr. Marquardt ordered a lidocaine infusion and beta
14  blockers for plaintiff and requested a consult from defendant Dr. O'Neill.  (Def.'s SUDF 13-14,
15  Lee Decl. & Ex. F.)

16  Dr. Marquardt identified Seroquel as a possible cause of plaintiff's tachycardia episode
17  and discontinued it.  On January 14, 2007, plaintiff underwent an echocardiogram performed by
18  Dr. Rohit Bhaskar.  Dr. Bhaskar noted an estimated ejection fraction of 45%.  He noted that the
19  apical septal wall and inferoapical wall were hypokinetic compared to other wall segments.  The
20  left atrium appeared slightly enlarged.  The anterior mitral valve leaflet appeared slightly
21  thickened with no definitive evidence for prolapse.  Color Doppler imaging revealed mild mitral
22  regurgitation and trace tricuspid regurgitation.  (Def.'s SUDF 15-16, Lee Decl. & Ex. F.)

23  On January 15, 2007, defendant Dr. O'Neill consulted with plaintiff.  Defendant Dr.
24  O'Neill noted that plaintiff had experienced spontaneous wide complex tachycardia in the context
25  of syncope.  Defendant Dr. O'Neill noted that the cardiac rhythm recorded on the monitor was
26  most consistent with Torsades De Pontes, and also noted that his 12-lead electrocardiogram
27  showed a prolonged QT interval of approximately 480 milliseconds.  Defendant Dr. O'Neill
28  noted that there was a recognized association between Seroquel and sudden cardiac death and that

plaintiff's Seroquel had accordingly been put on hold. Defendant Dr. O'Neill also noted plaintiff's family history of heart problems. In light of these factors, defendant Dr. O'Neill provided plaintiff with a detailed explanation of why he was at high risk of sudden cardiac arrest sufficient to warrant placement of an ICD. The defendant discussed the alternatives to placement of the ICD as well as the risks and benefits associated with that procedure. Defendant Dr. O'Neill considered the possibility that plaintiff's prolonged QT was induced by Seroquel but was able to dismiss this possibility when the QT interval remained prolonged after the Seroquel had been discontinued. Defendant Dr. O'Neill also discussed the situation with a Dr. Prizzi, the psychiatrist on-call at CSP-Sacramento. (Def.'s SUDF 17-18, O'Neill Decl., Lee Decl. & Ex. F.)

On the same day as his consultation with defendant Dr. O'Neill, plaintiff signed a consent form for placement of an ICD. This form stated that the surgery had been discussed with him, including its risks, benefits, and alternatives; that he had a chance to ask questions; that he had received all of the information that he desired; and that he consented to the surgery. On January 16, 2007, defendant Dr. O'Neill performed surgery on plaintiff to implant the ICD. Defendant Dr. O'Neill noted that informed consent was obtained from plaintiff. Plaintiff was placed under general endotracheal anesthesia. The following equipment was successfully implanted in plaintiff: Unit: Guidant Vitality 2 implantable cardioverter-defibrillator, T165, serial number 126005; Atrial Lead: Guidant model 4470, 52 cm length, serial number 529958; Ventricular Lead: Guidant Endotak Reliance G, model 0185, serial number 156975. The equipment was successfully tested without complications, and plaintiff was returned to recovery in stable condition. (Def.'s SUDF 19-20, Lee Decl. Exs. F & G.)[1]

On January 17, 2007, plaintiff was discharged from Mercy General Hospital. Defendant Dr. O'Neill advised plaintiff to seek immediate medical attention if he experienced multiple ICD shocks, and provided instruction to plaintiff on keeping his wound dry. It was noted that follow-up surveillance should be scheduled in four months. It was also noted that satisfactory thresholds

---

[1] Guidant Vitality 2 implantable cardioverter-defibrillator, T165, serial number 126005 has never been recalled. Guidant model 4470, 52 cm length, serial number 529958 has never been recalled. Guidant Endotak Reliance G, model 0185, serial number 156975 has never been recalled. (Def.'s SUDF 21-23, Def.'s Req. for Judicial Notice Exs. B-D.)

1    for the device were identified in the first postoperative day.  Plaintiff reported no pain, and was

2    discharged in fair condition.  (Def.'s SUDF 24-25, Lee Decl. & Exs. D & F.)

3          Plaintiff has not taken Seroquel since 2007.  Nonetheless, since 2007 plaintiff has

4    repeatedly exhibited a QTc greater than 450 ms, including on: February 25, 2008 (503 ms, 512

5    ms); July 13, 2009 (475 ms, 499 ms); October 31, 2009 (457 ms); August 5, 2009 (470 ms, 488

6    ms); August 6, 2009 (451 ms); August 20, 2009 (460 ms); May 13, 2010 (460 ms); August 6,

7    2010 (464 ms); August 9, 2010 (459 ms); October 18, 2011 (484 ms); November 1, 2011 (462

8    ms); November 5, 2011 (481 ms); December 6, 2011 (457 ms); February 29, 2012 (454 ms); and

9    April 9, 2012 (453 ms).  Plaintiff has never been shocked by his ICD.  (Def.'s SUDF 26-27, Lee

10   Decl. & Exs. E & F.)

11         Dr. Byron Lee is a licensed physician in the State of California and currently board

12   certified in cardiovascular diseases and clinical cardiac electrophysiology.  Dr. Lee is also an

13   Associate Professor of Medicine at the University of California, San Francisco Medical School in

14   the Cardiology Division.  According to defense counsel, Dr. Lee is qualified to opine on whether

15   the acts and omissions of a cardiac electrophysiologist constitute deliberate indifference to a

16   patient's medical needs, whether that conduct is medically acceptable under the circumstances,

17   and on medical causation.  (Def.'s SUDF 28, Lee Decl.)

18         Dr. Lee's opinion is that defendant Dr. O'Neill's care and treatment of plaintiff was

19   within the standard of care and was not deliberately indifferent to plaintiff's medical needs.

20   According to Dr. Lee, defendant Dr. O'Neill was seeking to protect plaintiff from the high

21   probability that he would experience sudden cardiac death.  Dr. Lee has concluded that defendant

22   Dr. O'Neill's conduct was medically appropriate for the following reasons:

> (i.) According to the records, Plaintiff exhibited a prolonged QTc interval of 454 ms when he presented to Mercy Folsom Hospital on January 13, 2007.  Dr. O'Neill noted that Plaintiff's QT interval was approximately 480 ms while he was at Mercy General Hospital.  Generally speaking, a QTc interval above 450 in a male is considered prolonged.  A prolonged QTc interval places a patient at an increased risk of experiencing sudden cardiac death.  Plaintiff also had a family history of cardiac problems including the death of his brother and mother.  His brother's death was described as sudden and occurring at a young age.  This is significant because a prolonged QTc interval is generally a genetic condition.  While it is

10

      possible for various medications to prolong a patient's QTc interval, the fact that Plaintiff was noted to have a prolonged QTc even after his Seroquel was held suggests that this was not the case with Plaintiff. Furthermore, the fact that Plaintiff repeatedly exhibited prolonged QTc above 450 ms for years after stopping Seroquel suggests that his prolonged QTc was genetic rather than drug induced.

      (ii.) The fact that Plaintiff's ejection fraction dropped from the 60% noted by Dr. Marquardt on January 13 to the 45% noted by Dr. Bhaskar on January 14 is significant because patients with low ejection fractions are more likely to experience sudden cardiac arrest. An ejection fraction is a measure of how well a heart is able to pump blood and represents the percentage of blood that is pumped out of a filled ventricle with each heartbeat. A normal ejection fraction is 50 to 70 percent, and when it drops below this level, the risk of sudden cardiac arrest increases significantly.

      (iii.) The fact that Dr. Bhaskar noted that Plaintiff's heart walls were hypokinetic compared to other wall segments is significant because it likely represents myocardial scar. Myocardial scar is known to be a source of arrhythmias that can cause sudden cardiac arrest and subsequent death.

      (iv.) Plaintiff was noted to have experienced a syncopal episode (loss of consciousness) with his arrhythmia. This means that his arrhythmia led to insufficient blood flow to the brain to maintain consciousness. Symptomatic arrhythmias that lead to syncope increase the risk of sudden cardiac arrest and sudden cardiac death.

      (v.) Plaintiff was noted to exhibit Torsades de Pointes. This is one of the most dangerous arrhythmias, and commonly precedes sudden cardiac arrest.

      (vi.) Plaintiff was being administered the anti-psychotic medication Seroquel against his will during the arrhythmic event. Seroquel and similar drugs have a recognized causal relationship with sudden cardiac arrest. In light of Plaintiff's long history of mental illness, it would have been reasonable for Dr. O'Neill to conclude that Plaintiff was likely to be on Seroquel or similar drugs associated with sudden cardiac arrest in the future. As a consulting electrophysiologist, Dr. O'Neill would not have had the power to override a court mandate and unilaterally discontinue all such medications in the future. As such, it was reasonable for him to attempt to mitigate the risks posed by such medications by recommending an ICD.

(Def.'s SUDF 29, Lee Decl.)

      According to defendant Dr. O'Neill, his decision to recommend an ICD to plaintiff was based on his best medical judgment to mitigate the risk of sudden cardiac death that plaintiff faced. At all times in the course of his treatment of plaintiff, defendant Dr. O'Neill sought to

further the best interest of plaintiff's health and well-being. According to defendant Dr. O'Neill, he never had any intention to inflict unnecessary harm or suffering on plaintiff. (Def.'s SUDF 32, O'Neill Decl.)

## THE PARTIES' ARGUMENTS

Defendant Dr. O'Neill has moved for summary judgment in his favor with respect to plaintiff's Eighth Amendment claim against him on the grounds that: (1) plaintiff's claim fails because he cannot establish state action; (2) even if the court determines that the defendant acted under color of state law, defendant Dr. O'Neill is entitled to qualified immunity; (3) the evidence on summary judgment establishes that defendant Dr. O'Neill was not deliberately indifferent to plaintiff's medical needs; (4) plaintiff's claim fails because placement of an implantable cardioverter defibrillator was not an objective serious harm; (5) plaintiff's claim fails because defendant Dr. O'Neill had no subjective intent to harm plaintiff; and (6) plaintiff's claim fails because placement of the implantable cardioverter defibrillator did not cause the harm alleged by plaintiff. (Def.'s Mem. of P. & A. 7-24.)

In opposition to defendant's motion, plaintiff argues that defendant Dr. O'Neill was engaged in state action when he treated him, and the defendant could not on any level avoid acknowledging that plaintiff was a state prisoner because he was brought to the defendant in prison attire. In addition, plaintiff argues that defendant Dr. O'Neill was deliberately indifferent to his serious medical needs because he implanted a recalled ICD in plaintiff's chest that was neither medically necessary nor a proper medical procedure in his case. According to plaintiff, defendant Dr. O'Neill knew that plaintiff's condition resulted from him taking Seroquel but nevertheless implanted the ICD for his own financial gain. Finally, plaintiff contends that he does not possess sufficient mental faculties to have appreciated the import of signing the informed consent form for the surgical procedure. (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 2, 5-11.)

## ANALYSIS

Based on the record before this court, the undersigned finds that defendant Dr. O'Neill is entitled to summary judgment on the merits of plaintiff's Eighth Amendment deliberate indifference claim. As an initial matter, the undersigned finds that based on the evidence

12

submitted on summary judgment and described above, defendant Dr. O'Neill has borne his initial burden of demonstrating that there is no genuine issue of material fact with respect to the adequacy of the medical care he provided to plaintiff in connection with the placement of plaintiff's ICD. Thus, given the evidence submitted by the defendant in support of the pending motion for summary judgment, the burden shifts to plaintiff to establish the existence of a genuine issue of material fact with respect to his inadequate medical care claim. The court has reviewed plaintiff's verified complaint and his opposition to defendant's pending motion. Drawing all reasonable inferences in plaintiff's favor, the court concludes that plaintiff has not submitted sufficient evidence at the summary judgment stage to create a genuine issue of material fact with respect to his claim that defendant Dr. O'Neill violated his rights under the Eighth Amendment.

Specifically, the evidence presented by plaintiff fails to show that defendant Dr. O'Neill responded to plaintiff's serious medical needs[2] with deliberate indifference. See Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106. As an initial matter, plaintiff argues that defendant Dr. O'Neill implanted a recalled ICD in plaintiff's chest. However, plaintiff has not submitted any evidence in support of this conclusory contention. At most, plaintiff has submitted a non-specific flyer he allegedly received in the mail entitled "Implantable Defibrillators (ICD), Leads, and Device Recalls." (Pl.'s Opp'n to Def.'s Mot. for Summ. J., Ex. A.) The flyer submitted by plaintiff in opposition to defendant's summary judgment motion is not a recall notice. Rather, it

---

[2] The parties do not dispute, and undersigned finds, that based upon the evidence presented by the parties on summary judgment, a reasonable juror could conclude that plaintiff's heart condition constitutes an objective, serious medical need. See McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment."); see also Canell v. Bradshaw, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the Eighth Amendment duty to provide medical care applies "to medical conditions that may result in pain and suffering which serve no legitimate penological purpose."). Plaintiff's largely undisputed medical record, as well as the observations and treatment recommendations by plaintiff's treating physicians and specialists, compel the conclusion that plaintiff's medical condition, if left untreated, could result in "further significant injury" and the "unnecessary and wanton infliction of pain." McGuckin, 974 F.2d at 1059.

1 merely announced a lecture presented at Mercy Hospital at which defendant Dr. O'Neill was
2 scheduled to provide attendees with information "concerning recalled medical devices used to
3 treat arrhythmias, and provide other information on implantable defibrillators, leads and
4 pacemakers." (Id.) This flyer relied upon by plaintiff simply does not refute defendant Dr.
5 O'Neill's evidence that the ICD he implanted in plaintiff has never been recalled. (Def.'s Req.
6 for Judicial Notice Exs. B-D.)

7 Next, plaintiff argues that defendant Dr. O'Neill implanted an ICD in him that was neither
8 medically necessary nor proper medical action. In support of this position, plaintiff declares that
9 a nurse once told him that he did not have a heart condition and instead had a bad reaction to
10 Seroquel. (Pl.'s Decl. at 1.) Plaintiff further declares that several doctors have told him that his
11 prolonged QT was drug-induced and that if he avoided certain medications he did not need a
12 defibrillator.[3] (Id. at 2.) Plaintiff has submitted with his opposition to defendant's motion for
13 summary judgment copies of his medical records indicating that on February 6, 2012, he met with
14 a Dr. Walter Chien at San Joaquin General Hospital. (Pl.'s Opp'n to Def.'s Mot. for Summ. J.,
15 Ex. F.) Dr. Chien's "assessment and plan" was to obtain plaintiff's medical records from Mercy
16 General Hospital to ascertain whether or not he had suffered a drug-induced Torsades. (Id.) If he
17 did, Dr. Chien noted that plaintiff would not have needed an ICD implant as long as he avoided
18 medication with long QT. (Id.) Plaintiff has also submitted copies of his medical records
19 indicating that on February 11, 2014, a Dr. Pavel Petrik at Antelope Valley Surgical Institute
20 surgically removed plaintiff's ICD, which was a "dysfunctional unit with no further need of use."
21 (Id. at Ex. E.)

22 However, as discussed above, a mere difference of opinion between medical professionals
23 as to the proper course of medical care does not give rise to a cognizable § 1983 claim. See
24 Snow, 681 F.3d at 988; Jackson, 90 F.3d at 332; Sanchez, 891 F.2d at 242; Franklin, 662 F.2d at
25 1344; see also Fleming v. Lefevere, 423 F. Supp. 2d 1064, 1070 (C.D. Cal. 2006) ("Plaintiff's

---

[3] Plaintiff also alleges in his verified complaint that, on August 18, 2010, and on August 23, 2010, Nurse Debbie and a Dr. John Doe examined him and told him that he never needed a defibrillator because the symptoms he experienced were due to excessive psychotropic medication and not a heart condition. (Sec. Am. Compl. at 23)

14

own opinion as to the appropriate course of care does not create a triable issue of fact because he has not shown that he has any medical training or expertise upon which to base such an opinion."). To establish that a difference of medical opinion as to the appropriate course of treatment amounted to deliberate indifference, plaintiff must also "show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that "they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." Jackson, 90 F.3d at 332. See also Toguchi, 391 F.3d at 1058.

In this case, plaintiff has not provided any evidence demonstrating that the course of treatment provided by defendant Dr. O'Neill's to plaintiff in 2007 was medically unacceptable under the circumstances. Specifically, Dr. Chien's medical report from February 6, 2012, merely indicated that he wanted to review plaintiff's medical records from Mercy General Hospital to better understand plaintiff's medical history and the potential cause of his prolonged QT. Dr. Petrik's operative report from February 11, 2014, only indicates that plaintiff's ICD was no longer functional or necessary at that time and that he therefore removed the device without complication. Most importantly, these reports do not speak to whether defendant Dr. O'Neill's decision to recommend and implant plaintiff's ICD back in 2007 was medically unacceptable in the opinions of Drs. Chien and Petrik. Nor do these reports cast doubt on the evidence produced on summary judgment by defendant Dr. O'Neill demonstrating that he considered and reasonably dismissed the possibility that plaintiff's prolonged QT was induced by Seroquel. (Def.'s Mot. for Summ. J., O'Neill Decl.)  In particular, the evidence presented in support of defendant O'Neill's motion for summary judgment shows that plaintiff's QT remained prolonged even after doctors discontinued his Seroquel. (Id., O'Neill Decl., Lee Decl. & Ex. F.)  Defendant Dr. O'Neill has also submitted unrefuted expert testimony from Dr. Lee establishing that his decision to recommend and implant plaintiff's ICD in response to plaintiff's medical needs in 2007 was medically appropriate under the circumstances as they presented at that time. (Id., Lee Decl.)

Plaintiff also has not come forward with any competent evidence to demonstrate that defendant Dr. O'Neill chose this course of treatment in conscious disregard of an excessive risk to plaintiff's health. At most, plaintiff surmises that defendant Dr. O'Neill implanted plaintiff's

15

ICD for the defendant's own financial gain.  However, plaintiff has not supported his contention with factual allegations or any evidence whatsoever.  By merely expressing his vague and speculative opinion in this regard, plaintiff fails to create a genuine issue of material fact.  See Hansen v. United States, 7 F.3d 137, 138 (9th Cir.1993) ("When the non-moving party relies on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact."); Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

Finally, plaintiff summarily argues for the first time in his opposition to defendant's pending motion that defendant Dr. O'Neill implanted the ICD without plaintiff's informed consent because he was mentally incapable of providing informed consent.  As an initial matter, an opposition to a motion for summary judgment is not a proper vehicle for adding new claims to a complaint, and the court need not consider this argument.  See Wasco Products v. Southwallx Technologies, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings); Brass v. County of Los Angeles, 328 F.3d 1192, 1197–98 (9th Cir. 2003) (upholding the district court's finding that plaintiff had waived § 1983 arguments raised for first time in summary judgment motion where nothing in amended complaint suggested those arguments, and plaintiff offered no excuse or justification for failure to raise them earlier); see also Williams v. Rodriguez, No. C 10–2715 RMW (PR), 2012 WL 1194160 at *9 (N.D. Cal. Apr. 10, 2012) (declining to consider plaintiff's attempt to transform his claim against a defendant doctor on summary judgment from one instance of cancelling a morphine prescription to a claim that the defendant doctor denied him pain medication for years).

Moreover, it is undisputed that plaintiff signed the informed consent form for the procedure at issue which defendant Dr. O'Neill performed.  (Def.'s Mot. for Summ. J., Lee Decl. Ex. G.)  The form stated that the surgery had been discussed with plaintiff including its risks, benefits, and alternatives; that he had a chance to ask questions; that he had received all of the

information that he desired; and that he consented to the surgery. (Id.) Although plaintiff was under a Keyhea order at the time of the surgical procedure, he has come forward with no evidence on summary judgment to show that he could not mentally comprehend the risks of the procedure when he signed the informed consent form. Again, plaintiff's vague and speculative allegations alone are insufficient to create a disputed fact with respect to the medical treatment provided by defendant Dr. O'Neill in this case.[4]

In sum, as observed at the outset above, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex Corp., 477 U.S. at 322; see also Addisu v. Fred Meyer, 198 F.3d 1130, 1134 (9th Cir. 2000) ("A scintilla of evidence or evidence that is

---

[4] The undersigned notes that in dismissing claims brought by prisoners against medical personnel for failure to obtain informed consent, courts have characterized such claims as a matter of state tort law. See, e.g., Aidnik v. Cal. Dep't of Corrs. & Rehab., No. CIV S-09-0154 FCD KJM (E.D. Cal. Dec. 6, 2010), 2010 WL 5059691 at *3 n.4 ("Moreover, it does not appear that failing to obtain informed consent rises to the level of an Eighth Amendment violation."); Cardona v. Syverson, No. 2:11-cv-1680 TLN KJN P, 2013 WL 3941019 at *11 (E.D. Cal. July 30, 2013) ("A claim based on lack of informed consent – which sounds in negligence – arises when the doctor performs a procedure without first adequately disclosing the risks and alternatives."); Martin v. Beck, No. 2:12-cv-0421 JFM (PC), 2012 WL 4208303 at *3 (E.D. Cal. Sept. 19, 2012) ("Here, at most, plaintiff alleges facts tending to indicate that defendant failed to secure plaintiff's informed consent before performing a surgery to correct a split-stream urinary problem. Because mere negligence does not rise to the level of a 'cruel and unusual punishment' under the Eighth Amendment, plaintiff's Eighth Amendment claim against defendant fails."); Foster v. Bhambi, No. 1:10-cv-01288 AWI GSA PC, 2012 WL 1999848 at *8 (E.D. Cal. June 4, 2012) ("Plaintiff alleges that he unknowingly signed a consent form for the surgery which was performed on him. To the extent that Plaintiff alleges that Dr. Bhambi failed to provide him with informed consent, without authority, Plaintiff's remedy would be found under California law.") Nonetheless, while a claim for failure to obtain informed consent may arise under state tort law, under certain circumstances not present here, such a claim in connection with medical treatment may also be part and parcel of a federal constitutional claim cognizable under § 1983. See Runnels v. Rosendale, 499 F.2d 733 (9th Cir. 1974) ("Allegations that prison medical personnel performed major surgical procedures upon the body of an inmate, without his consent and over his known objections, that were not required to preserve his life or further a compelling interest of imprisonment or prison security, may foreshadow proof of conduct violative of rights under the Fourteenth Amendment sufficient to justify judgment under the Civil Rights Law."); Mackey v. Procunier, 477 F.2d 877, 878 (9th Cir. 1973) (prisoner stated a cognizable cruel and unusual punishment claim by alleging he received a "fright drug" and was subject to experimentation and "guinea pig" treatment without his consent).

merely colorable . . . does not present a genuine issue of material fact" but rather there "must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion."). Defendant Dr. O'Neill has satisfied the initial burden of coming forward with evidence demonstrating the absence of a genuine issue of material fact with respect to the Eighth Amendment claim brought against him, and plaintiff has failed to respond with any proof from which a reasonable trier of fact could find in his favor with respect to his claim. Accordingly, the court concludes that defendant Dr. O'Neill is entitled to summary judgment in his favor on plaintiff's claim that he was deliberately indifferent to plaintiff's serious medical needs in violation of his rights under the Eighth Amendment.[5]

### OTHER MATTERS

Defendant Dr. O'Neill has requested that judicial notice be taken of various materials in the record, including medical device manufacturer information on the devices in question, as well as the fact that plaintiff's ICD, atrial lead, and ventricular lead have not been the subject of a recall. Pursuant to Federal Rule of Evidence 201, the court will grant defendant's request for judicial notice.

### CONCLUSION

IT IS HEREBY ORDERED that defendant's request for judicial notice (Doc. No. 79-5) is granted.

IT IS HEREBY RECOMMENDED that:

1. Defendant's motion for summary judgment (Doc. No. 79) be granted; and

2. This action be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the

---

[5] In light of the findings and recommendations herein, the court declines to address defendant's alternative arguments or defense counsel's formal objections to plaintiff's evidence.

objections shall be filed and served within seven days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: December 3, 2014

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:9
jone2049.57